[Nos. A099536, A099647. First Dist., Div. Three. May 11, 2004.]

CHARLENE VINE, Plaintiff and Respondent, v.
BEAR VALLEY SKI COMPANY, Defendant and Appellant.

578

580

COUNSEL

Hancock Rothert & Bunshoft, Paul D. Nelson, Paul J. Killion, Michael L. Reitzell; Tucker Ellis & West and Peter J. Koenig for Defendant and Appellant.

O'Reily Collins & Danko, Michael S. Danko, Gary L. Simms and Niall G. Yamane for Plaintiff and Respondent.

OPINION

**PARRILLI, J.**—In personal injury cases arising from sporting activities, a defendant cannot be charged with a duty to protect the plaintiff from risks inherent in the sport. Those risks are borne by the plaintiff as a matter of law, under the "primary assumption of risk" doctrine. However, the defendant can be held liable for breaching the duty not to increase the risks encountered by the plaintiff beyond the level inherent in the sport. This is an aspect of "secondary assumption of risk," which operates as part of the comparative fault scheme. The plaintiff's acceptance of the risk is weighed together with the defendant's breach of duty as the trier of fact determines the parties' proportionate responsibility for the injury. (*Knight v. Jewett* (1992) 3 Cal.4th 296, 314–316 [11 Cal.Rptr.2d 2, 834 P.2d 696] *(Knight)*; *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003–1004 [4 Cal.Rptr.3d 103, 75 P.3d 30] *(Kahn)*; *American Golf Corp. v. Superior Court* (2000) 79 Cal.App.4th 30, 36–37 [93 Cal.Rptr.2d 683].)

Here, a jury was asked to determine whether a ski resort "was negligent in the design, construction, testing, or supervision of the snow board jump on which plaintiff was injured." The trial court refused to instruct the jury on assumption of risk, instead giving ordinary negligence and contributory negligence instructions. This was reversible error. Although assumption of risk has been "merged into the comparative fault scheme" in its secondary aspect (*Knight, supra*, 3 Cal.4th at p. 315), the doctrine still poses distinct

questions regarding the parties' relative responsibilities. These questions must be properly framed for a jury.

We also hold that ski resort employees who are not covered by workers' compensation for injuries sustained while participating in recreational activity on their own initiative may not claim the protection of Labor Code section 2801. That statute bars employers from raising assumption of risk as a defense in negligence actions by employees injured in the course of their employment.

## BACKGROUND

Charlene Vine suffered a broken back, resulting in paraplegia, when she fell while attempting a snowboard jump at an employee party hosted by her employer, Bear Valley Ski Company (Bear Valley) after the end of the public ski season. A Bear Valley employee had reshaped the jump, using a snow cat, for use by guests at the party. Vine sued Bear Valley, contending the jump was a dangerous condition that increased the risks to snowboarders beyond those inherent in the sport. A jury awarded her $3,727,000 in special damages and $713,000 in noneconomic damages. Vine moved for a new trial on noneconomic damages. The trial court granted the motion, but ruled the judgment would be affirmed if Bear Valley accepted an additur of nearly $5.3 million in noneconomic damages. Bear Valley rejected the additur and appealed from both the judgment and the order granting a new trial. We have consolidated the two appeals.

We discuss further procedural and factual details below, in connection with the issues raised by Bear Valley. Bear Valley contends the trial court erred by: (1) ruling in limine that workers' compensation was not Vine's exclusive remedy; (2) denying Bear Valley's motion for summary judgment based on a release executed by Vine; (3) denying summary judgment based on primary assumption of risk; (4) failing to instruct the jury on primary assumption of risk, secondary assumption of risk, or "the obvious hazard doctrine;" and (5) granting a new trial on noneconomic damages. Because the instructional error requires reversal, we need not address the propriety of the new trial ruling.

## DISCUSSION

1. *The Workers' Compensation Bar*

Bear Valley first raised the workers' compensation issue in a motion for summary judgment. The court denied the motion, finding triable issues of fact as to whether Vine was in the course and scope of her employment at the time of the injury, and whether she was exempted from the worker's

compensation scheme by Labor Code section 3352, subdivision (f). Under that provision, "[a]ny person employed by a ski lift operator to work at a snow ski area who is relieved of and not performing any prescribed duties, while participating in recreational activities on his or her own initiative" is not an "employee" for workers' compensation purposes.

The parties revisited the issue in a jointly filed pretrial motion, asking the trial court to determine whether Vine's remedy was limited to workers' compensation based on the following stipulated facts:

"[P]laintiff's injury was sustained in the course and scope of her employment.

"Plaintiff was defendant's employee.

"Plaintiff was injured during a corporate function.

"The corporate function was an employee party.

"Plaintiff's accident resulted from her engaging in a recreational activity (snowboard jumping).

"The recreational activity was part of the party's entertainment.

"Plaintiff was providing working assistance at the party before she went snowboarding.

"Defendant re-shaped portions of the jump on which plaintiff was injured specifically for the party.

"The ski area was not open to the general public on the date plaintiff was injured.

"Eric Bottomley is the Vice President of Operations for Bear Valley Ski Company.

"If Charlene Vine and Eric Bottomley were called to testify, they would testify as per the attached."

"Eric Bottomley, if called to testify, would also state that he had spoken with Charlene Vine in advance of the employee party about needing her help during the event."

The parties attached excerpts from the depositions of Bottomley and Vine. Bottomley testified that employees were not required to attend the party. Vine had agreed to help him as a volunteer with bartending and a raffle. After working for a while she was "just hounding and hounding" Bottomley to let her go snowboarding, and he finally agreed.

Vine testified it was the season-ending party for Bear Valley employees and their families. The facility was closed to the general public. She had not planned on snowboarding that day, but a contest had begun and "a couple of people had come up to me and told me there w[ere] no girls entered and they wanted me to go snowboarding." She changed into her ski clothes and took a couple of jumps off a small jump on the edge of a sun deck. People were cheering and someone was announcing over a microphone. Vine did not remember the circumstances under which she decided to go to a larger jump on a nearby hill, where her injury occurred. "I just remember there was a bunch of people headed toward the jump, and the next thing I remember is standing next to the jump . . . ."

Vine contended she was exempted from the workers' compensation scheme by Labor Code section 3352, subdivision (f) because she was employed by Bear Valley to work at its ski area, and was snowboarding on her own initiative during a break from her bartending duties when she was injured. Bear Valley noted the workers' compensation statutes are liberally construed in favor of coverage. (Lab. Code, § 3202.) It argued that once Vine stipulated she was in the course and scope of her employment, she could not claim she was "not performing any prescribed duties" and "participating in recreational activities on . . . her own initiative" within the meaning of Labor Code section 3352, subdivision (f). Bear Valley emphasized that snowboarding was an anticipated feature of the party, and Vine was encouraged to participate by her peers.

In response, Vine observed Labor Code section 3352, subdivision (f) was enacted in response to a Colorado Supreme Court decision holding that a ski resort bartender was in the course of his employment when he was injured while skiing during his time off, using his employee ski pass. (*Dorsch v. Industrial Commission* (1974) 185 Colo. 219 [523 P.2d 458, 460]; see *Northstar at Tahoe v. Workers' Comp. Appeals Bd.* (1996) 42 Cal.App.4th 1481, 1485 [50 Cal.Rptr.2d 475].) Thus, it did not matter that she had stipulated she was in the course of her employment; the Legislature acted to exempt ski resort employees from coverage during off-hour recreational activity precisely because that activity might be considered part of "the course of their employment."

The court agreed with Vine, and ruled that Labor Code section 3352, subdivision (f) exempted her from workers' compensation coverage. Bear

Valley challenges that finding. It contends application of the statutory exemption to the stipulated facts is a question of statutory interpretation subject to our independent review.

At oral argument, Bear Valley suggested that once a ski resort employee arrives at an employer-sponsored party (assuming the party is within the course of the employment), all injuries suffered during recreational activities provided by the employer are covered by workers' compensation as a matter of law—that is, the activity cannot be considered to have been undertaken on the employee's "own initiative" under Labor Code section 3352, subdivision (f).

■ We disagree. Participation in the resort's recreational activities is a common feature of employment at ski resorts. The mere fact that the activity occurs at an employee-only party is not enough to take it out of the scope of the exemption provided by the Legislature specifically for such recreational activity. Determining whether an employee participated on her "own initiative" requires examination of the particular circumstances, including the extent to which the employer sponsored, encouraged, supervised, or otherwise participated in the activity.

■ Vine correctly argues that the trial court's finding on this issue is subject to the substantial evidence standard of review. The application of Labor Code section 3352, subdivision (f) to the stipulated facts is a mixed question of law and fact, which is predominantly factual and "requires application of experience with human affairs;" therefore, it is governed by the substantial evidence test. (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888 [264 Cal.Rptr. 139, 782 P.2d 278].) When conflicting inferences may be drawn from stipulated facts, we must accept the trial court's resolution of the conflict if it is supported by reasonable inference. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632–634 [80 Cal.Rptr.2d 378]; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2003) ¶ 8:60, p. 18-23.)

■ Here, while Bear Valley reshaped the jump for use by its employees at the party, there was no evidence it overtly encouraged Vine to participate, or that its representatives took an active role in employees' use of the jump. There was strong evidence that Vine herself persistently lobbied Bottomley to be released from her duties at the party to go snowboarding. Reasonable inferences from the stipulated facts support the trial court's determination *that she went snowboarding on her own initiative, and thus came within* the exemption provided by Labor Code section 3352, subdivision (f).

## 2. Labor Code Section 2801

Before we address Bear Valley's assumption of risk arguments, we consider Vine's claim that Labor Code section 2801 precluded Bear Valley from raising assumption of risk as a defense. This argument was presented to the trial court in the parties' joint pretrial motion, along with the worker's compensation issue discussed above. The court rejected the claim, and properly so. Our review of this question of statutory interpretation is de novo. (*Department of Rehabilitation v. Workers' Comp. Appeals Bd.* (2003) 30 Cal.4th 1281, 1290 [135 Cal.Rptr.2d 665, 70 P.3d 1076].)

The relevant provisions of Labor Code section 2801 state: "In any action to recover damages for a personal injury sustained within this State by an employee while engaged in the line of his duty or the course of his employment as such . . . in which recovery is sought upon the ground of want of ordinary or reasonable care of the employer . . . . [¶] It shall not be a defense that: [¶] (a) The employee either expressly or impliedly assumed the risk of the hazard complained of." Section 2801 appears in division 3 of the Labor Code, and applies only if an employee is not covered by the workers' compensation scheme. (Lab. Code, § 2700; *Devens v. Goldberg* (1948) 33 Cal.2d 173, 176–177 [199 P.2d 943].)

Vine contends it is consistent to hold that she was both "in the course of [her] employment" at the time of her injury for purposes of Labor Code section 2801, and "not performing any prescribed duties, while participating in recreational activities on . . . her own initiative" for purposes of the exemption from workers' compensation coverage provided by Labor Code section 3352, subdivision (f). She notes Labor Code section 3352, subdivision (f) is predicated on the notion that exempted employees are "in the course of employment" for workers' compensation purposes (otherwise, there would be no need for an exemption). She also argues that while the exemption excluded her from the definition of "employee" in the workers' compensation scheme, the Supreme Court has stated that the benefits of Labor Code section 2801 may be extended to a plaintiff who is not an "employee" for workers' compensation purposes. (*Edwards v. Hollywood Canteen* (1946) 27 Cal.2d 802, 811 [167 P.2d 729].)

We are not persuaded. Just as "employee" status may operate differently under Labor Code section 2801 and the workers' compensation scheme, so may the "course of employment" determination. Labor Code section 2801 refers to "the course of [] employment *as such*" (italics added), suggesting the Legislature contemplated a more restrictive application of "course of employment" than it has prescribed in the workers' compensation statutes, which include off-duty recreational activities if they are a reasonable

expectation of the employment. (Lab. Code, § 3600, subd. (a)(9); see *Kidwell v. Workers' Comp. Appeals Bd.* (1995) 33 Cal.App.4th 1130, 1136 [39 Cal.Rptr.2d 540].) Employees voluntarily taking advantage òf such recreational benefits are not the intended beneficiaries of Labor Code section 2801, which is based on the rationale that " 'the employee is in a weak economic position, that he is unable to risk refusal to work in an unsafe place or with an unsafe appliance, hence should not be held to the penalty imposed on one who acquiesces in a danger.' [Citation.] . . . [T]he workman has no alternative but the loss of his livelihood; it is his poverty and not his will which consents, and economically he is no more free to leave his employment than a soldier or a sailor." (*Fonseca v. County of Orange* (1972) 28 Cal.App.3d 361, 368 [104 Cal.Rptr. 566].)

Furthermore, Vine's interpretation of the statute would lead to absurd results. Ski resorts would be barred from raising assumption of risk defenses, express or implied, in actions by employees injured while skiing on their own time side by side with members of the public who have signed releases expressly assuming the risk of the hazards associated with the sport, or who would otherwise be subject to the implied assumption of risk defenses. Vine, of course, happened to be injured at an employee-only party, but her reading of Labor Code section 2801 would apply equally to the more typical situation in which an off-duty employee is injured while skiing during the regular season. (See, e.g., *Northstar at Tahoe v. Workers' Comp. Appeals Bd., supra,* 42 Cal.App.4th at p. 1484.)

▇ Nothing suggests the Legislature meant to treat ski resort employees enjoying the recreational opportunities afforded by their employment differently from the general public, which pays for the privilege of using a resort's facilities and assumes the well-known risks of doing so.[1] "It is the duty of the courts, whenever possible, to interpret statutes so as to make them workable and reasonable, and to avoid absurd applications." (*Northstar at Tahoe v. Workers' Comp. Appeals Bd., supra,* 42 Cal.App.4th at p. 1485.) It would be unreasonable to bar the assumption of risk defenses in cases brought by ski resort employees injured during off-duty recreation, while permitting the resort to raise those defenses in actions by its customers. Such a rule might well lead to the loss of the ski pass as a form of compensation for resort employees. We hold that ski resort employees who are exempt from workers' compensation coverage under Labor Code section 3352, subdivision (f) are not also exempt from assumption of risk under Labor Code section 2801.

---

[1] In this case, it appears the release signed by Vine was on the same form signed by Bear Valley's paying customers. It begins, "In consideration for the purchase of a Bear Valley Mountain Resort season pass . . . ."

## 3. *The Release*

Bear Valley also moved for summary judgment based on a release signed by Vine when she received her employee season pass. The operative terms of the release were as follows:

"I understand and am aware that skiing is a HAZARDOUS ACTIVITY involving INHERENT AND OTHER RISKS of injury to any and all parts of my body. I further understand that injuries in the sport are a COMMON AND ORDINARY OCCURRENCE, and I freely ACCEPT AND ASSUME ALL RISKS OF INJURY OR DEATH that might be associated with my participation in this sport.

". . . To the fullest extent allowed by law, I agree to RELEASE FROM LIABILITY, and to INDEMNIFY AND HOLD HARMLESS Bear Valley Mountain Resort . . . from any and all liability on account of, or in any way resulting from, personal injuries, death or property damage, even if caused by NEGLIGENCE, in any way connected with my participation in this sport. I further AGREE NOT TO MAKE A CLAIM OR SUE FOR INJURIES OR DAMAGES in any way connected with my participation in this sport, even if caused by NEGLIGENCE."

The court denied Bear Valley's summary judgment motion, finding the terms of the release ambiguous in that "skiing" does not necessarily include snowboarding. The court also ruled that a reference in the pass to the 1999–2000 "season" did not unambiguously apply to Vine's injuries, evidently on the theory that the employee party did not occur during the "season" because it took place after the slopes had been closed to the public until the next season.

Bear Valley notes the court also excluded any reference to the release during trial. It does not challenge the propriety of that ruling, however, claiming only that the court erred by failing to grant summary judgment. Vine protests that Bear Valley is improperly seeking a more favorable standard of review by limiting its appellate claims in this fashion. (See *Solis v. Kirkwood Resort Co.* (2001) 94 Cal.App.4th 354, 360–361 [114 Cal.Rptr.2d 265] [contrasting deferential review of trial court's assessment of extrinsic evidence to resolve ambiguity in release with independent review of summary judgment ruling].) Vine's point is well taken. Review of a ruling denying summary judgment is inappropriate when "the same questions raised by the motion are then decided adversely to the unsuccessful moving party after a trial on the merits which is itself free from prejudicial error." (*Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 836 [16 Cal.Rptr.2d 38]; see also Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs, *supra*, ¶ 2:242.2,

p. 2-107.) Here, while we conclude the trial court did err in another regard, Bear Valley may not pass over the court's ruling on the release at trial in order to get another bite at the summary judgment apple.

In any event, the court's denial of summary judgment was plainly correct. The release was ambiguous, at least as to whether the term "skiing" included snowboarding. Bear Valley presented no extrinsic evidence to resolve the ambiguity. It merely noted Vine's deposition testimony that she understood she had executed a release in exchange for her season pass. This evidence shed no light on the meaning of the terms in the release. Bear Valley argued below, as it does in this court, that "skiing" includes snowboarding as a matter of law under *Campbell v. Derylo* (1999) 75 Cal.App.4th 823 [89 Cal.Rptr.2d 519]. The *Campbell* court concluded a jury might find that a snowboarder's conduct violated a county ordinance providing safety regulations for skiers. (*Id.* at p. 829.) However, the pertinent question in this case is how a reasonable person in Vine's position would have believed Bear Valley understood the scope of the release. (*Solis v. Kirkwood Resort Co.*, *supra*, 94 Cal.App.4th at p. 361.) *Campbell* does not answer that question.[2]

### 4. *Primary Assumption of Risk*

A third ground on which Bear Valley sought summary judgment was primary assumption of risk. Bear Valley contended it owed no duty to protect Vine against risks of injury inherent in the sport of snowboard jumping. Vine responded that she did not assume the risk of a defective jump. She presented a declaration from an accident reconstruction expert opining that the jump's design was defective and subjected those using it to an extreme risk of serious injury. The court decided the primary assumption of risk doctrine did not apply, because "the sport of snowboarding does not inherently require jumps which are designed in such a way as to create an extreme risk of injury. (*Branco v. Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184 [43 Cal.Rptr.2d 392].)"

Bear Valley contends the court erred by denying summary judgment. It also claims the court improperly denied a proposed jury instruction on

---

[2] Should the issue arise again in litigation following remand, we note for the benefit of the parties and the trial court that an easy answer is not necessarily provided by the general rule that ambiguities in a contract are construed against the party who drafted the terms. That maxim applies only when other canons of construction, including consideration of extrinsic evidence of the parties' intent, fail to resolve the ambiguity. (*Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1448 [66 Cal.Rptr.2d 487]; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 798 [79 Cal.Rptr.2d 273].)

We note also that if the express assumption of risk in the release applies, the implied assumption of risk principles discussed in *Knight* would not come into play. (*Allan v. Snow Summit, Inc.* (1996) 51 Cal.App.4th 1358, 1374–1375 [59 Cal.Rptr.2d 813]; *Allabach v. Santa Clara County Fair Assn.* (1996) 46 Cal.App.4th 1007, 1012–1013 [54 Cal.Rptr.2d 330].)

primary assumption of risk. Vine asserts the summary judgment ruling is not appealable. She argues the court properly refused to instruct the jury on primary assumption of risk, because the defense presents only legal issues for the court to determine.

Again, we deem it inappropriate to review the summary judgment ruling. There are circumstances in which a denial of summary judgment is reviewable after a trial on the merits. (*Waller v. TJD, Inc., supra*, 12 Cal.App.4th at p. 836.) However, in this case a great deal more evidence was presented at trial than in the summary judgment proceedings on the critical question of whether the jump on which Vine was injured was defectively constructed. The interests of justice would not be served if we ignored the fully developed record and conducted an independent review of the summary judgment papers. (*Id.* at pp. 835–836.)

In any event, as with the question of the release (see pt. 3, *ante*), the court's denial of summary judgment on primary assumption of risk was clearly correct. As the moving defendant, Bear Valley had the burden of showing that one or more elements of Vine's cause of action could not be established. (Code Civ. Proc., § 437c, subd. (o)(2); *Merrill v. Navegar* (2001) 26 Cal.4th 465, 476–477 [110 Cal.Rptr.2d 370, 28 P.3d 116].) Primary assumption of risk operates to foreclose any duty owed by the defendant to the plaintiff, and thus is a defense that is generally "amenable to resolution by summary judgment." (*Knight, supra*, 3 Cal.4th at p. 313; *Kahn, supra*, 31 Cal.4th at p. 1004.)

However, "[a]lthough defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in [a] sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport." (*Knight, supra*, 3 Cal.4th at p. 315–316; *Kahn, supra*, 31 Cal.4th at p. 1004.) Vine's complaint was premised on the allegation that Bear Valley's jump "constituted a dangerous and defective condition, likely to cause persons using the jump to injure themselves, and increasing the risks to snowboarders such as plaintiff over and above those inherent in the sport."

Therefore, in order to establish it owed no duty to Vine because she had assumed the risk of injury, Bear Valley had to show either that its jump did not increase the inherent risks of snowboard jumping, or that whatever defects the jump may have had were included in those risks. It attempted neither showing in its moving papers, contending merely that falling is an inherent risk of the sport. This was not sufficient to require Vine to undertake the burden of raising a triable issue of fact as to whether the jump posed risks beyond those inherent in snowboard jumping. (Code Civ. Proc., § 437c,

subd. (o)(2); see *Solis v. Kirkwood Resort Co., supra*, 94 Cal.App.4th at pp. 364–366 [while falling is inherent risk of skiing, whether artificial jumps built by resort increased inherent risk and created duty to warn was question for jury].)[3]

■ We discuss Bear Valley's proposed jury instruction on primary assumption of risk below, in connection with secondary assumption of risk. Primary assumption of risk per se is not a proper subject for jury instruction. Our Supreme Court has made it clear that whether primary assumption of risk negates a defendant's duty to protect the plaintiff from a particular risk is a legal determination to be made by the court, not the jury. (*Knight, supra*, 3 Cal.4th 296, 313; *Kahn, supra*, 31 Cal.4th 990, 1003–1004.) Thus, Bear Valley might properly have raised the issue at trial by way of a motion for directed verdict (which would have resulted in a ruling we could properly review). ■ Nevertheless, in certain circumstances primary and secondary assumption of risk are intertwined and instruction is required so the jury can properly determine whether the defendant did, in fact, increase the risks inherent in a hazardous sport so that secondary assumption of risk should be considered.

### 5. *Secondary Assumption of Risk*

In *Kahn*, our Supreme Court summarized *Knight*'s reconciliation of the doctrines of assumption of risk and comparative fault as follows: "We observed that the term 'assumption of risk' had been used in connection with two classes of cases: those in which the issue to be resolved was whether the defendant actually owed the plaintiff a duty of care (primary assumption of risk), and those in which the defendant had breached a duty of care but where the issue was whether the plaintiff had chosen to face the risk of harm presented by the defendant's breach of duty (secondary assumption of risk). ([*Knight, supra*, 3 Cal.4th] at pp. 303–304, 308.) In the latter class of cases, we concluded, the issue could be resolved by applying the doctrine of comparative fault, and the plaintiff's decision to face the risk would not

---

[3] Bear Valley refers us to *Estate of Harshman v. Jackson Hole Mountain Resort* (D.Wyo. 2002) 200 F.Supp.2d 1329, 1342–1346, in which the court determined that the risk of a fatal crash landing by an experienced snowboarder taking a jump in a "terrain park" that had been modified the night before was an inherent risk of snowboard jumping. We note that a similar result was reached in *Shukoski v. Indianhead Mountain Resort, Inc.* (6th Cir. 1999) 166 F.3d 848, 852–853, holding that a snowboarder who was rendered quadriplegic after falling on a jump in a "terrain garden," clearly marked as an expert slope, assumed the risk of his injuries. Neither of these opinions, however, considered whether the defendants' elevation of inherent risks took the case out of the scope of the assumption of risk doctrine as it has developed in California. Both emphasized that the plaintiffs were injured in specially designated parks with warning signs. (*Harshman, supra*, 200 F.Supp.2d at p. 1344–1345; *Shukoski, supra*, 166 F.3d at p. 852.)

operate as a complete bar to recovery. In such a case, the plaintiff's knowing and voluntary acceptance of the risk functions as a form of contributory negligence. (*Id.* at pp. 308, 310–311.)" (*Kahn, supra,* 31 Cal.4th at p. 1003.)

 Cases like this one, where the plaintiff contends the defendant breached the duty not to increase the risks inherent in a hazardous sporting activity, present both aspects of the assumption of risk doctrine. If the plaintiff fails to show any increase in the inherent risks, or if the trial court determines that the only risks encountered were inherent in the sport, the defendant prevails based on primary assumption of risk. If the jury, properly instructed on the scope of the defendant's duty, determines the defendant did increase the inherent risk, it then considers the plaintiff's claim based on secondary assumption of risk as an aspect of the plaintiff's comparative fault. (*American Golf Corp. v. Superior Court, supra,* 79 Cal.App.4th 30, 36–37; *Branco v. Kearny Moto Park, Inc., supra,* 37 Cal.App.4th at p. 193.) "This second determination of duty, however, still hinges upon the trial court's determination of the question of duty in the first instance, by defining the risks inherent in the sport at issue." (*Staten v. Superior Court* (1996) 45 Cal.App.4th 1628, 1633 [53 Cal.Rptr.2d 657].)[4]

 The duty aspect of the secondary assumption of risk doctrine was actually addressed by Bear Valley's proposed jury instruction on primary assumption of risk.[5] The secondary assumption of risk instruction offered by Bear Valley addressed the risk of injury Vine assumed when she attempted

---

[4] Whether the defendant has increased the risks inherent in a sport is a question reserved for the court insofar as it involves the legal determination of the scope of the defendant's duty. The court may consider expert opinion regarding the risks customarily considered "inherent," though expert opinion is not controlling on the ultimate legal question of duty. (*Kahn, supra,* 31 Cal.4th at p. 1017; see, e.g., *Kane v. National Ski Patrol System, Inc.* (2001) 88 Cal.App.4th 204, 213–214 [105 Cal.Rptr.2d 600] [ski patrol instructor's assessment of terrain and of students' ability presented inherent risk, despite criticism from numerous experts].) However, once the court has resolved the issue of what the inherent risks are, whether the defendant in fact increased those risks under the circumstances of a particular case may be a question for the jury. (*Kahn, supra,* 31 Cal.4th at p. 1018; see, e.g., *Campbell v. Derylo, supra,* 75 Cal.App.4th at pp. 829–830 [whether snowboarder increased risks to skier by failing to use retention strap on his snowboard was jury question]; *Van Dyke v. S.K.I. Ltd.* (1998) 67 Cal.App.4th 1310, 1317–1318 [79 Cal.Rptr.2d 775] [whether sign post on ski run increased risk to skier was question of fact reserved for trial].)

[5] This proposed instruction stated:

"The defendant has no duty to eliminate, reduce or make safer the inherent risks of injury which arise from the nature of the sport of recreational snowboard jumping or the manner in which it is conducted. An inherent risk of a sport is one that cannot be eliminated without fundamentally changing the nature of the sport or chilling vigorous participation in the sport.

"The defendant is under a duty to use ordinary care not to increase the risks to a snowboarder over and above those inherent in the sport. The defendant is under a duty to

the jump.[6] We agree with Bear Valley that the court erred by rejecting these instructions, which explained principles crucial to the jury's deliberations. "A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct on specific terms that relate the party's theory to the particular case. [Citations.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572 [34 Cal.Rptr.2d 607, 882 P.2d 298].)

Vine claims the court's instruction on contributory negligence with BAJI No. 3.50 sufficiently informed the jury regarding secondary assumption of risk.[7] She argues that because the doctrine "is merged into the comparative fault scheme" (*Knight, supra,* 3 Cal.4th at p. 315), it would be duplicative and potentially confusing to instruct the jury on both concepts. A review of the discussion in *Knight* demonstrates the inadequacy of this general comparative negligence instruction in the secondary assumption of risk context. A central part of *Knight*'s reasoning was that a plaintiff's voluntary assumption of the risks of a dangerous sport "functions as a form of contributory negligence," as the *Kahn* court put it, even if the plaintiff's decision to participate was not "unreasonable" and thus not, strictly speaking, a negligent act. (*Kahn, supra,* 31 Cal.4th at p. 1003; *Knight, supra,* 3 Cal.4th at p. 314.) *Knight* addressed this point in response to the concern of an amicus curiae that a defendant whose breach of duty played only a minor role in the

refrain from constructing a jump for use by the public which, by design, poses an extreme risk of injury.

"A failure to fulfill such duty is negligence."

Bear Valley also submitted an alternative version of this instruction, including this statement: "A finding that defendant's conduct may have increased the severity of the injury suffered is not a finding that defendant increased the risk of injury beyond that inherent in recreational snowboard jumping." The parties raise no issue concerning the propriety of the additional statement.

[6] This proposed instruction stated:

"If you find that defendant breached its duty of care to plaintiff, plaintiff's knowing encounter with a risk of injury caused by defendant's breach, if any, is to be considered by you in determining the plaintiff's comparative negligence or fault. A person who is aware of a risk of harm created by a defendant's breach of duty but fails to avert the harm is comparatively negligent for the injury.

"You should consider all of the surrounding circumstances established by the evidence, including, but not limited to, the plaintiff's maturity, intelligence, experience and capacity, along with all the other surrounding circumstances as shown by the evidence."

Again, Bear Valley submitted an alternative instruction with additional material, none of which is material to the issues before us.

[7] This instruction informed the jury:

"Contributory negligence is negligence on the part of a plaintiff which, combining with the negligence of a defendant, contributes as a cause in bringing about the injury.

"Contributory negligence, if any, on the part of the plaintiff does not bar a recovery by the plaintiff against the defendant but the total amount of damages to which the plaintiff would otherwise be entitled must be reduced in proportion to the amount of negligence attributable to the plaintiff."

plaintiff's injury might nevertheless face a damage award undiminished by the plaintiff's comparative fault, if the jury decided the plaintiff's choice to engage in a dangerous activity was voluntary but also reasonable:

"Although we agree with the general thesis of amicus curiae's argument that persons generally should bear personal responsibility for their own actions, the suggestion that a duty approach to the doctrine of assumption of risk is inconsistent with this thesis rests on a mistaken premise. Past California cases have made it clear that the 'comparative fault' doctrine is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury (*whether their responsibility for the injury rests on negligence*, strict liability, *or other theories of responsibility*), in order to arrive at an 'equitable apportionment or allocation of loss.' [Citations.]

"Accordingly, contrary to amicus curiae's assumption, we believe that under California's comparative fault doctrine, a jury in a 'secondary assumption of risk' case would be entitled to take into consideration a plaintiff's voluntary action in choosing to engage in an unusually risky sport, *whether or not the plaintiff's decision to encounter the risk should be characterized as unreasonable*, in determining whether the plaintiff properly should bear some share of responsibility for the injuries he or she suffered. [Citations.] Thus, in a case in which an injury has been caused by both a defendant's breach of a legal duty to the plaintiff and the plaintiff's voluntary decision to engage in an unusually risky sport, application of comparative fault principles will not operate to relieve either individual of responsibility for his or her actions, but rather will ensure that neither party will escape such responsibility." (*Knight, supra*, 3 Cal.4th at pp. 313–314, italics added; and see *Kahn, supra*, 31 Cal.4th at p. 1005, fn. 2 [analysis of *Knight* plurality has been adopted by Supreme Court].)

Therefore, it was not sufficient for the jury to be instructed that Vine's recovery should be diminished in proportion to her "negligence." The court gave the standard negligence instructions from BAJI, quoted in full below,[8]

---

[8] "Negligence is the doing of something which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do under circumstances similar to those shown by the evidence.

"It is the failure to use ordinary or reasonable care.

"Ordinary or reasonable care is that care which persons of ordinary prudence would use in order to avoid injury to themselves or others under circumstances similar to those shown by the evidence." (BAJI No. 3.10.)

"One test that is helpful in determining whether a person was negligent is to ask and answer the question whether or not, if a person of ordinary prudence had been in the same situation and possessed of the same knowledge, he would have foreseen or anticipated that someone might have been injured by or as a result of his action or inaction. If the answer to that

which characterized negligence as "something which a reasonably prudent person would not do," and "the failure to use ordinary or reasonable care . . . under circumstances similar to those shown by the evidence." The circumstances shown by the evidence were that many Bear Valley employees took the jump at the party. The jury saw a videotape of about 30 of Vine's fellow employees safely completing the jump. There was no suggestion that all these people acted negligently when they voluntarily chose to face the risks posed by the jump. As we explain below in our analysis of the prejudice caused by the court's instructional error, it was the *manner* in which Vine attempted the jump that the jury was likely to consider negligent, not her willingness to take the risk.

The instructions were equally erroneous regarding the duty of care owed by Bear Valley. The court directed the jury to evaluate Bear Valley's conduct by the standard of "ordinary or reasonable care," under which a party has acted negligently if a "person of ordinary prudence . . . would have foreseen or anticipated that someone might have been injured" as a result of the party's "action or inaction." (BAJI Nos. 3.10 and 3.11; see fn. 8, *ante*.) The jury was told to apply this ordinary standard of care even if Bear Valley's conduct conformed to the standards customary in the ski resort industry. (BAJI No. 3.16; see fn. 8, *ante*.) Nowhere was the jury informed that Bear Valley owed Vine no duty to protect her from the risks inherent in snowboard jumping. Indeed, the instructions suggested just the opposite, since it was clearly foreseeable that the inherent risks of riding a snowboard over the jump built by Bear Valley might result in injury.

The ski resort setting is such an obvious example of assumed risk that *Knight* used it as an example in discussing the scope of a property owner's duty:

"[A] property owner ordinarily is required to use due care to eliminate dangerous conditions on his or her property. [Citation.] In the sports setting, however, conditions or conduct that otherwise might be viewed as dangerous often are an integral part of the sport itself. Thus, although moguls on a ski run pose a risk of harm to skiers that might not exist were these configurations removed, the challenge and risks posed by the moguls are part of the

---

question is 'yes,' and if the action or inaction reasonably could have been avoided, then not to avoid it would be negligence." (BAJI No. 3.11.)

"The amount of caution required of a person in the exercise of ordinary care depends upon the conditions that are apparent or that should be apparent to a reasonably prudent person under circumstances similar to those shown by the evidence." (BAJI No. 3.12.)

"Evidence as to whether a person conformed or did not conform to a custom that had grown up in a given locality or business is relevant and ought to be considered, but is not necessarily controlling on the issue whether that person was negligent. That issue must be determined by the standard of care that I have stated to you." (BAJI No. 3.16.)

sport of skiing, and a ski resort has no duty to eliminate them. [Citation.] In this respect, the nature of a sport is highly relevant in defining the duty of care owed by the particular defendant.

"Although defendants generally have no legal duty to eliminate (or protect a plaintiff against) risks inherent in the sport itself, it is well established that defendants generally do have a duty to use due care not to increase the risks to a participant over and above those inherent in the sport. Thus, although a ski resort has no duty to remove moguls from a ski run, it clearly does have a duty to use due care to maintain its towropes in a safe, working condition so as not to expose skiers to an increased risk of harm. The cases establish that the latter type of risk, posed by a ski resort's negligence, clearly is not a risk (inherent in the sport) that is assumed by a participant. [Citation.]" (*Knight, supra,* 3 Cal.4th at pp. 315–316.)[9]

The duty to safely maintain towropes is not an apt comparison to Bear Valley's role in shaping the mound of snow that Vine and others jumped over at the employee party. The jump, unlike towropes, was an essential component of the sporting activity itself. *Knight* pointed out that "the nature of a defendant's duty in the sports context depends heavily on the nature of the sport itself. Additionally, the scope of the legal duty owed by a defendant frequently will also depend on the defendant's role in, or relationship to, the sport." (*Knight, supra,* 3 Cal.4th at p. 317.) *Knight* proceeded to approve cases analyzing "the duty of the owner of a ballpark or ski resort, in the process defining the risks inherent in the sport not only by virtue of the nature of the sport itself, but also by reference to the *steps the sponsoring business entity reasonably should be obligated to take in order to minimize the risks without altering the nature of the sport.*" (*Ibid.,* italics added.)

This passage in *Knight* provides the appropriate standard of care by which Bear Valley's liability should have been determined.[10] The jury should have considered not whether an ordinarily prudent person in Bear Valley's position

[9] Numerous cases arising from ski resort injuries have considered various aspects of the assumption of risk doctrine. For post-*Knight* examples beyond those cited in this opinion, see 6 Witkin, Summary of Cal. Law (9th ed., 2003 supp.) Torts, § 1090C, pp. 339–343; see also Annotation, Ski Resort's Liability for Skier's Injuries Resulting From Condition of Ski Run or Slope (2004) 55 A.L.R.4th 632 section 4.

[10] The duties of proprietors of sporting venues are distinct from those of coparticipants or instructors, who are not held to have increased the inherent risks of a sport unless they intentionally injure another or engage in reckless conduct outside the range of the sport's ordinary activities. (*Knight, supra,* 3 Cal.4th at p. 318 [coparticipants]; see, e.g., *Mastro v. Petrick* (2001) 93 Cal.App.4th 83, 91 [112 Cal.Rptr.2d 185] [snowboarder colliding with skier held to "reckless" standard]; *Kahn, supra,* 31 Cal.4th at p. 1011 [instructors]; see *Kane v. National Ski Patrol System, Inc., supra,* 88 Cal.App.4th at pp. 213–214 [ski patrol instructor held to "reckless" standard]; see generally *Morgan v. Fuji Country U.S.A., Inc.* (1995) 34 Cal.App.4th 127, 133–134 [40 Cal.Rptr.2d 249].)

would have anticipated that someone might be injured on the jump, but what steps Bear Valley should reasonably have taken to minimize the risks without altering the nature of the sport of snowboard jumping. This standard has been approved in a similar case involving injuries sustained by a bicyclist who fell while riding over a man-made jump in a "moto park." (*Branco v. Kearny Moto Park, Inc.*, *supra*, 37 Cal.App.4th at pp. 187, 192–193; see also *Morgan v. Fuji Country USA, Inc.*, (1995), 34 Cal.App.4th 127, 134 [40 Cal.Rptr.2d 249] [golf course operator owed duty to minimize risks of being struck by balls without altering nature of sport].) Bear Valley's proposed primary assumption of risk instruction properly explained its obligation not to increase the inherent risks of snowboard jumping, while preserving the participants' opportunity to vigorously engage in the sport. (See fn. 5, *ante*.) The court erred by failing to give the assumption of risk instructions offered by Bear Valley.[11]

The dissent acknowledges it would have been "advisable" to give the primary assumption of risk instruction proposed by Bear Valley, but contends the error is harmless in light of the evidence and the arguments of counsel. As to Bear Valley's proposed instruction on secondary assumption of risk, however, the dissent argues the evidence did not support the instruction because there was no showing Vine was aware of the increased risk posed by the negligent formation of the jump. We agree there was no such showing, but none was required.

A "knowing encounter with a risk of injury caused by defendant's breach," as posited in Bear Valley's proposed instruction based on the language of *Knight*, does not entail knowledge of the breach and its causative effects, either in law or in logic. If Vine had encountered this jump while snowboarding by herself, decided to try it, and only later learned it was shaped by Bear Valley in a particularly dangerous way, Bear Valley would still have been entitled to raise an assumption of risk defense in a negligence action by Vine. It is the *risk* that must be appreciated by a plaintiff for the assumption of risk doctrine to come into play, not the defendant's breach of duty.

The dissent acknowledges Vine need not have been aware of Bear Valley's breach, but argues the proposed instruction depended on a showing that she

---

[11] Bear Valley also challenges the court's failure to give a proposed instruction on what Bear Valley terms the "obvious hazard doctrine." The court properly rejected this instruction, which told the jury Bear Valley had no duty to warn Vine of an obvious hazard. While Vine did include a duty to warn allegation in her complaint, she did not argue that theory of liability to the jury. Furthermore, after *Rowland v. Christian* (1968) 69 Cal.2d 108 [70 Cal.Rptr. 97, 443 P.2d 561], landowners have not been excused from liability flowing from obvious hazards if injury was foreseeable. (See 6 Witkin, Summary of Cal. Law, Torts, *supra*, § 931, p. 302; *id.*, (2003 supp.) pp. 218–220.)

knew the jump posed "more than the normal" risks. The dissent correctly notes that *Knight* refers to the plaintiff's knowledge of risks "created" or "imposed" by the defendant's breach. (*Knight, supra,* 3 Cal.4th at pp. 310–311, 315.) However, as we read *Knight,* the plaintiff's encounter with the risk must be "knowing" only in the general sense that the plaintiff understood the nature of the risk involved. Thus, Vine understood and assumed the risk of injuring herself in a fall on the snow, but she did not assume the risk of landing on a spike concealed in the jump.[12] Some elevation of the inherent danger of falling must have been created by Bear Valley's negligence for Vine to have an actionable claim; however, she did not have to subjectively appreciate the elevated increment of the risk to assume the inherent risks of snowboard jumping.

We recognize that *Knight* includes in its secondary assumption of risk discussion "see" citations to authorities approving consideration of plaintiffs' subjective awareness of risk. (*Knight, supra,* 3 Cal.4th at p. 314, citing *Kirk v. Washington State University* (1987) 109 Wn.2d 448 [746 P.2d 285, 290–291]; Schwartz, Comparative Negligence, [(1st ed. 1974)], § 9.5, p. 180; and Diamond, *Assumption of Risk After Comparative Negligence: Integrating Contract Theory into Tort Doctrine* (1991) 52 Ohio St. L.J. 717, 748–749.) However, in cases where secondary assumption of risk arises from defendants' breach of the duty not to increase a sport's inherent risk, requiring plaintiffs to be specifically aware of the increase would be inconsistent with *Knight*'s analysis. Plaintiffs could avoid the assumption of risk defense by claiming they were ignorant of the effects of defendants' negligence, "however minor," and "voluntary risk takers" would "avoid all responsibility for their own actions." (*Knight, supra,* 3 Cal.4th at p. 313.) Indeed, a plaintiff would be most likely not to notice the results of the defendant's negligence when the increase in the inherent risk was only slight, and the defense would be unavailable where it is most appropriate.

Here, for instance, had the jury decided that Bear Valley increased the inherent risks of the jump by 5 percent, no fault would be allocated to Vine for her assumption of risk unless Bear Valley could prove she perceived the enhanced fraction of the risk (or part of it, at least, according to the dissent). We do not believe this is what *Knight* intended; in such a case, assumption of risk is an available defense if the plaintiff participated in the sport with knowledge of its inherent risks. Obviously, if a plaintiff *is* aware of an increased risk created by the defendant, that awareness can be included in

---

[12] The fact that Bear Valley was the provider of a venue for sporting activities distinguishes this case from *Calhoon v. Lewis* (2000) 81 Cal.App.4th 108, 116 [96 Cal.Rptr.2d 394], in which the court held that residential property owners owed no duty to protect a skateboarder from the risk of falling on a pipe located in a planter box.

the jury's evaluation of comparative fault. But *Knight* does not predicate secondary assumption of the risk on such specific subjective considerations.

 *Knight* contemplated a "flexible, commonsense" consideration of comparative fault by the jury, in which "both a defendant's breach of a legal duty to the plaintiff and the plaintiff's voluntary decision to engage in an unusually risky sport" are weighed by the jury to reach an equitable apportionment of fault. (*Knight, supra,* 3 Cal.4th at p. 314 [11 Cal.Rptr.2d 2, 834 P.2d 696].) Whether (and by how much) it is fair to reduce a plaintiff's recovery for injuries caused by the defendant's negligent elevation of the risk, even if the plaintiff was unaware of the increase in the risk, is a question for the trier of fact to decide in light of the particular circumstances of each case. Here, the instructions failed to present this critical question to the jury. Bear Valley's proposed instruction asking the jury to consider Vine's "knowing encounter with a risk of injury caused by defendant's breach" adequately framed the question, and should have been given.[13]

 It is probable the instructional error prejudicially affected the verdict. The "natural and probable effect of the error" on Bear Valley's "ability to place [its] full case before the jury" was substantial—Bear Valley was effectively deprived of the opportunity to present an assumption of risk defense to the jury. (*Soule v. General Motors Corp., supra,* 8 Cal.4th 548, 580.) It was not able to ask the jury to factor Vine's decision to accept the jump's risks into the determination of comparative fault, and the jury was given a grossly inaccurate yardstick for measuring the scope of Bear Valley's duty to the employees using the jump. Our Supreme Court has directed us to

---

[13] The dissent accuses Bear Valley of faulting the court for not giving an instruction Bear Valley never proposed. It is true Bear Valley's proposed instructions did not include a salient qualification—that comparative fault may be assigned for engaging in a risky sport even if the plaintiff did not act unreasonably. While Bear Valley relies on this point for the first time in its appellate brief, it also squarely challenges the court's failure to give its proposed instructions. Those instructions correctly reflected principles established in *Knight,* and adopted *Knight*'s terminology. While the proposed instructions could have been better tailored to fit the circumstances of this case (we offer an example below), it cannot seriously be disputed that Bear Valley properly preserved its claim of instructional error.

A fuller explanation of the assumption of risk doctrine as it applied in this case might read as follows:

"The defendant had no duty to protect the plaintiff from the risks of injury inherent in the sport of recreational snowboard jumping. An inherent risk is one that cannot be eliminated without fundamentally changing the nature of the sport or chilling vigorous participation in the sport.

"The defendant did have a duty not to increase the risks of snowboard jumping beyond the level of risk inherent in the sport. If the defendant breached that duty, it was negligent. However, in determining the parties' comparative fault, you should consider the plaintiff's voluntary decision to encounter the risks of snowboard jumping. Whether the plaintiff acted reasonably or not in choosing to take those risks, you may reduce her recovery to account for her assumption of risk by whatever amount you find proper in light of all the evidence."

look at four further factors in evaluating the prejudicial effect of instructional error: (1) the state of the evidence; (2) the effect of other instructions; (3) the effect of counsel's arguments; and (4) any indications by the jury itself that it was misled. (*Id.* at pp. 580–581.) Only the first three factors apply in this case.

The evidence certainly supported a finding that Vine assumed a substantial risk. There was no dispute at trial that snowboarding is a very risky sport. Whether the design of the jump magnified the risks was a disputed issue. Bear Valley's expert on "terrain parks," who viewed photographs of the jump at issue and the videotape of employees using the jump on the day Vine was injured, testified that the jump was typical of those used around the world, and could not have been designed to exclude the possibility that a jumper would lose "body control." Nevertheless, Bear Valley was held to a standard of ordinary care, and the jury was not told to weigh Vine's acceptance of the risks of snowboard jumping when assessing her share of the fault for her injuries. The other instructions, as discussed above, did nothing to cure these problems. Instead, they greatly overstated Bear Valley's duty and omitted any mention of Vine's assumption of risk.

We agree with the dissent that the prejudice to Bear Valley on the issue of its duty was mitigated by the way the case was presented. Vine's counsel did not suggest Bear Valley could be held liable merely because an injury to snowboard jumpers was foreseeable, although the instructions would have permitted such a finding. The evidence and argument was properly aimed at whether the jump was negligently constructed so as to pose risks beyond those normally encountered by snowboarders.

On the other hand, the jury was not informed that Bear Valley had *no duty* to take steps to reduce the risks inherent in snowboard jumping, or to change the essential nature of the sport. Bear Valley was thus deprived of a powerful avenue of argument. However, we need not decide whether this error alone was prejudicial. Considering it together with the court's failure to instruct the jury that Vine's recovery could be diminished by her assumption of risk, we believe it is reasonably probable the jury was actually misled in its apportionment of fault. (*Soule v. General Motors Corp.*, *supra*, 8 Cal.4th at p. 581, fn. 11.)

Vine, and the dissent, contend the jury's allocation of 54.4 percent of the fault to Vine demonstrated that the jury held her accountable for her decision to participate in a risky sport. A close examination of the closing arguments, and the evidence on which they were based, convinces us otherwise. Vine's counsel proposed and disputed a number of grounds on which the jury might be tempted to consider Vine contributorily negligent: (1) "simply taking the

jump;" (2) taking the jump despite risks she should have understood; (3) taking a jump bigger than any she had tried before; (4) failing to reach the jump's landing area; and (5) losing her balance when she was airborne. Counsel argued against holding Vine responsible for taking a risky jump by noting that she was a very experienced snowboard jumper, and that many others were taking this particular jump, which was supposed to have been designed for anyone to use safely regardless of its size. He argued against faulting Vine for her technique by contending the jump's design was to blame for her loss of control.

Bear Valley's counsel, after referring the jury to the test for negligence provided in BAJI No. 3.11 (whether an ordinarily prudent person in the same situation would have anticipated injury), emphasized that snowboard jumping is a risky activity and Vine deliberately chose to take this jump. He analyzed Vine's "jumping technique" at length, noting her failure to build enough speed on her approach, her "stiff legged" and backward-leaning posture instead of keeping a low center of gravity while balanced over her board, and her flailing arms as she lost control in the air, causing her to land on her back instead of her feet. Counsel pointed out that none of the other jumpers the jury saw on the videotape had lost control in this manner.

The evidence of Vine's faulty performance of the jump was undisputed and overwhelming. It came from witnesses for both parties. While the evidence that snowboard jumping is risky was also undisputed, the attempt by Bear Valley's counsel to direct the jury's attention to this factor found no support in the instructions. A failure to exercise reasonable care to avoid injury under the circumstances was easily correlated with Vine's failure, despite her considerable snowboarding experience, to properly execute the fundamental jumping techniques. It was not easily connected to her decision to accept the risks of snowboard jumping, as she had safely done many times before and as many of her peers were doing without injury on the same day and on the same jump.

Even if the jury were inclined to consider the factor of risk in its allocation of fault, the instructions given by the court provided Vine's counsel with a potent rejoinder. In his rebuttal, he characterized Bear Valley's argument as "there are some risks here in snowboarding, and because there are risks, we don't have to be careful." In his closing comments to the jury, counsel dismissed risk as an irrelevant consideration: "Hey, risk, risk in sport. That's not the way it goes. That's not what the jury instructions will tell you. The jury instructions will tell you that if you could foresee somebody being injured by your screwup, and you could avoid the screwup, that the failure to do so is negligence."

The instructions, including the court's admonition to rely on the law as it was stated in the instructions, fully supported counsel's legally erroneous argument. The argument was improper because it was clear, under *Knight*, that risk in sport is indeed "the way it goes" in actions to recover for injuries sustained while participating in hazardous recreation. The instructions prevented the jury from considering assumption of risk in an obviously appropriate context. Snowboarding is a classic example of a sport that requires participants to assume considerable risks. It is fundamentally unfair for a snowboarding injury case to go to a jury without any instruction on assumption of risk. We cannot say the court's instructional error had no effect on the verdict.

## DISPOSITION

The judgment is reversed. Bear Valley shall recover its costs on appeal.

Corrigan, Acting P. J., concurred.

**POLLAK, J.,** Concurring and Dissenting.—I agree with the analysis of the majority as to all issues except the conclusion that the judgment should be reversed because of the trial court's failure to give an unrequested instruction as to secondary assumption of the risk. Before turning to that issue, however, I wish to expand somewhat on the reasons for which I concur in the conclusion that plaintiff Charlene Vine's claim does not come within the scope of the Workers' Compensation Act (the Act), Labor Code section 3200 et. seq.[1]

*Plaintiff's injury is not covered by workers' compensation.*

"The right to workers' compensation benefits is wholly statutory. [Citations.] 'This statutory right is exclusive of all other statutory and common law remedies, and substitutes a new system of rights and obligations for the common law rules governing liability of employers for injuries to their employees.' " (*Northstar at Tahoe v. Workers' Comp. Appeals Bd.* (1996) 42 Cal.App.4th 1481, 1484 [50 Cal.Rptr.2d 475] (*Northstar at Tahoe*).) Labor Code section 3600 provides for workers' compensation benefits where certain conditions of compensation are met. The conditions of compensation include, among other things, that "at the time of the injury, both the employer and the employee are subject to the compensation provisions of this division" and that "at the time of the injury, the employee is performing service growing out of and incidental to his or her employment and is acting within the course of his or her employment." (§ 3600, subd. (a)(1) & (2).) Section 3600,

---

[1] All statutory references are to the Labor Code unless otherwise indicated.

subdivision (a)(9) provides further that an employee is entitled to compensation benefits "[w]here the injury does not arise out of voluntary participation in any off-duty recreational, social, or athletic activity not constituting part of the employee's work-related duties, except where these activities are a reasonable expectancy of, or are expressly or impliedly required by, the employment."

In 1974, the Colorado Supreme Court held that under similar statutory provisions an employee of a ski resort was acting within the course of his employment, and thus was entitled to compensation benefits, even though he was injured while skiing on his day off. (*Dorsch v. Industrial Commission* (1974) 185 Colo. 219 [523 P.2d 458].) The court reasoned that when an employer's principal business is recreation, the proper test for determining whether the injured employee was in the course of employment requires consideration of "(1) the extent to which the employer derives substantial benefit from the policy—beyond the intangible value of improvement of employee morale; (2) the extent to which the recreational activity represents compensation for employment; (3) the extent to which the obligations of employment create the special danger which precipitates the injury; (4) whether the use of the recreational activity was an inducement for employment; (5) whether the use of the recreational facility was originally contemplated by the parties at the time of employment." (*Id.* at pp. 222–223 [523 P.2d at p. 460].) Applying this test, the *Dorsch* court concluded that the employee was injured in the course of his employment because the employer used the ski pass as an incentive to attract employees to the ski area, the ski pass was a part of the employee's remuneration, and finally, the use of the ski pass was contemplated by the parties from the beginning of the employment. (*Id.* at p. 223 [523 P.2d at p. 460].)

In order to avoid such an outcome under the California statute, the Legislature amended section 3352 by adding subdivision (f), which excludes from the definition of an employee subject to the provisions of the workers' compensation law: "Any person employed by a ski lift operator to work at a snow ski area who is relieved of and not performing any prescribed duties, while participating in recreational activities on his or her own initiative." (§ 3352, subd. (f); *Northstar at Tahoe, supra*, 42 Cal.App.4th at p. 1485, quoting from 3d reading analysis of Sen. Bill No. 548 (1975–1976 Reg. Sess.) [" 'According to the [bill's] author, a recent Colorado Supreme Court decision granted worker compensation benefits to a ski resort bartender who was injured while skiing on his time off on his employer's premises. *Proponents of this legislation hope that it will prevent such an injury from being compensable also in California.*' "].)

As the majority indicates, the parties here submitted a joint pretrial motion, based on the undisputed facts recited in the majority opinion, requesting the

trial court to determine whether plaintiff's injury was covered by the workers' compensation statute. Contrary to Bear Valley's assertion, the stipulation that Vine was injured in the course of her employment does not necessarily establish workers' compensation coverage. Section 3352 contains 14 exclusions from the broad definition of an employee in section 3351 that apply throughout the Act. (§ 3350.) Under section 3352, subdivision (f), a person such as Vine employed by a ski lift operator to work at a snow ski area is not an "employee" for purposes of the Act if at the time of the injury she was "relieved of and not performing any prescribed duties, while participating in recreational activities on . . . her own initiative." It is clear that snowboarding was not among Vine's prescribed job duties. Thus, there is no real dispute that she had been "relieved of and [was] not performing any prescribed duties" when she was injured. The more difficult question is whether her snowboarding at the employee party, when she was not helping at the bar, was participation in a recreational activity "on . . . her own initiative."

While I agree with the majority that there is substantial evidence to support the trial court's determination that Vine was snowboarding on her own initiative, I believe that this conclusion finds further support in cases addressing the applicability of section 3352, subdivision (f) and section 3600, subdivision (a)(9). In *Northstar at Tahoe, supra,* 42 Cal.App.4th at pages 1483–1485, the court found that a ski area employee injured while skiing on her day off was excluded as a covered employee by subdivision (f). As the employee was not required to be at the ski resort at all at the time of the injury, there was no dispute that she had been relieved of all prescribed duties and was skiing on her own initiative. (*Northstar at Tahoe,* at p. 1485.) On the other hand, in *Lane v. Homewood Mountain Resort* (Jan. 25, 2002, Cal. Workers' Comp. App. Bd. No. SAC 301121), the Workers' Compensation Appeals Board found that section 3352, subdivision (f), did not preclude recovery of workers' compensation benefits where the employer had encouraged an employee to participate in a company-sponsored event in which she was injured. The plaintiff was injured while participating in a furniture race in which staff members from each department entered different vehicles made from furniture. The race was put on by the ski area, and the marketing department encouraged each department to enter a sled. The sleds were checked for safety by the employer, and the employer judged the competition. The race took place after the slopes had closed for the day, but the bar and restaurant were still open. The appeals board found that while prior to the start of the race plaintiff had finished work for the day, she was not engaging in the recreational activity on "her own initiative" because of her employer's encouragement and participation in the event.

Non-ski-related cases turning on the meaning of section 3600, subdivision (a)(9), provide some additional guidance. Although section 3352 was not at issue in these cases, coverage for the injuries sustained during off-duty

recreational activities turned in these cases on whether the activities were "expressly or impliedly required by . . . the employment" under section 3600, subdivision (a)(9). In *Smith v. Workers' Comp. Appeals Bd.* (1987) 191 Cal.App.3d 127, 141–142 [236 Cal.Rptr. 248] (*Smith*), the court held that a high school math teacher who died in a windsurfing accident while at a school picnic was entitled to benefits because his attendance at the off-campus math club picnic was an implied requirement of his employment. The court held that "[b]ecause attendance at the picnic was an implied requirement of decedent's employment, his accident which resulted from his engaging in the recreational activities which were part and parcel of the picnic's 'entertainment' is causally connected to his employment." (*Id.* at p. 142.) Similarly, in *Ezzy v. Workers' Comp. Appeals Bd.* (1983) 146 Cal.App.3d 252, 263 [194 Cal.Rptr. 90], the court held that a part-time student law clerk injured at a law-firm sponsored softball game was entitled to workers' compensation benefits where "it was reasonable for [her] to feel that she was expected to participate." In contrast, in *Todd v. Workers' Comp. Appeals Bd.* (1988) 198 Cal.App.3d 757, 760 [243 Cal.Rptr. 925] (*Todd*), the court held that an employee injured while playing basketball on his employer's property during his lunch break was not entitled under section 3600, subdivision (a)(9) to workers' compensation benefits. The court reasoned that "[a]lthough the employer apparently condoned the playing of basketball on the premises, there was no evidence that the employer required, encouraged, or sponsored the recreational activity." (*Todd, supra,* 198 Cal.App.3d at p. 760; see also *Mason v. Lake Dolores Group* (2004) 117 Cal.App.4th 822, 838 [11 Cal.Rptr.3d 914].)

Here, it is undisputed that Vine was asked by Eric Bottomley, the vice-president of operations for Bear Valley, to attend the employee party and to help out at the bar during the party. The parties stipulated that Vine was providing "working assistance" before she was injured. Thus, her attendance at the party could well be considered an implied requirement of her employment—she did not attend the party entirely on her own initiative. However, there was no requirement that she go snowboarding when she finished at the bar. Bear Valley argues that snowboarding was the entertainment for the party, just as windsurfing was the entertainment for the picnic in *Smith, supra,* 191 Cal.App.3d 127, but there is a significant difference between these two cases. In *Smith,* the teacher's obligation at the picnic was to participate in the extracurricular activities, presumably to develop a relationship with the students as well as to provide supervision. Thus, the teacher's participation in the activity was an implied requirement of his employment. Here, however, Vine's work-related obligation was to help serve beer at the bar. In no way did her implicit obligations extend to snowboarding. In this respect, this case is more similar to *Northstar at Tahoe, supra,* 42 Cal.App.4th 1481, and particularly to *Todd, supra,* 198 Cal.App.3d 757. Although Bear Valley

obviously provided the facilities that enabled her to snowboard, it did not expressly or impliedly require her to engage in that activity. The intent behind section 3600, subdivision (a)(9) "was to eliminate from workers' compensation coverage injuries sustained during recreational, social, or athletic activities which are only remotely work-related." (*Todd, supra,* 198 Cal.App.3d at p. 759.) As seen above, section 3352, subdivision (f) was added to strengthen this limitation and to ensure that no exception was made for persons working at snow ski areas. Accordingly, because Vine was not performing work-related duties and chose to go snowboarding on her own initiative, the trial court correctly determined that she is not entitled to workers' compensation benefits for the injury she sustained, and therefore that she is entitled to maintain this action.

*The jury instructions were not prejudicially erroneous.*

The issue that was presented to the jury in this case was whether Vine was injured because of the "open and obvious" risks of snowboard jumping, or because Bear Valley negligently created a jump that unreasonably increased the risks over and above those that were apparent to snowboarders and inherent in the sport. The jury was instructed that "plaintiff seeks to recover damages based upon a claim of negligence," and the special verdict asked the jury to determine whether defendant was "negligent in the design, construction, testing, or supervision of the snow board jump on which plaintiff was injured."

Vine presented three expert witnesses who testified that the jump was unreasonably unsafe and substantially increased the risk of injury inherent in the sport and apparent to the average snowboarder. One expert explained that the jump was designed in a manner that resulted in excessive landing force, in violation of snowboard jump standards issued by the United States Ski and Snowboard Association (USSSA) and similar Canadian standards. Another concluded, "[T]he jump that [Vine] took was not a safe jump, that it was unsafe, and it subjected her to a equivalent impact height of about 12 feet . . . the same as if she had fallen directly down onto a flat surface from a height of 12 feet." The jump was designed with a concavity that increased the velocity of the snowboarder and the force upon impact; if the jump had been rounded rather than concave, Vine would have sustained an equivalent impact height of only one and one-half feet from her jump. Under USSSA standards, the maximum equivalent impact height is five feet, and under Canadian standards the equivalent is two and a half feet. In his closing argument, Vine's attorney argued, "This was a bad jump. Instead of taking the usual day and a half to build a jump, Mr. Murphy built the jump in about somewhere around an hour, hour and a half, something like that. [¶] A jump that's properly designed is supposed to be that you can land anywhere on it without

sustaining unnecessarily high equivalent impact forces, unnecessarily high forces upon landing." He detailed how his expert witnesses had testified the jump did not comply with industry standards and why these deviations made the jump unsafe. Based on this evidence he argued that the jury should find that the jump was negligently designed. He also argued that Bear Valley was negligent in testing the jump because Murphy failed to test it as is required under industry standards, and failed to provide supervision because the ski patrol did not inspect the jump and was not even on the hill at the time of the injury. Bear Valley's evidence was to the contrary. Its witnesses testified that the jump on which Vine was injured was typical of snowboard jumps and could not have been designed to eliminate the risk of injury.

Throughout the course of proceedings in the trial court, defense counsel repeatedly urged the court to instruct the jury on primary assumption of the risk.[2] Bear Valley's first contention on appeal as to why the trial court prejudicially erred in giving the instructions it did is that it refused to give a primary assumption of risk instruction. The trial court refused to give such an instruction because, under *Knight v. Jewett* (1992) 3 Cal.4th 296, 313 [11 Cal.Rptr.2d 2, 834 P.2d 696] (*Knight*) and its progeny (e.g., *Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003–1004 [4 Cal.Rptr.3d 103, 75 P.3d 30]), primary assumption of risk is a question for the court and not for the jury, as the majority recognizes (maj. opn., *ante*, at p. 592). The court, not the jury, determines the duty that a defendant owes to the plaintiff, and the jury determines whether the defendant breached that duty. As *Knight* and many other cases make clear, a participant in a sporting activity such as snowboarding accepts the risks inherent in the sport as a matter of law—that is the primary assumption of risk and presents no question for the jury to determine. (*Knight, supra,* 3 Cal.4th at p. 313.) Here, the trial court determined that Bear Valley was under a duty not to increase the risks beyond those that are inherent in snowboarding. As the matter was submitted to the jury, Bear Valley was liable only if the jury found that Bear Valley had increased those risks by negligently designing and constructing a jump that was more dangerous than it appeared to be.

---

[2] Bear Valley proffered an instruction entitled "No Duty to Protect Against Inherent Risks of a Sport (Primary Assumption of Risk)," which read as follows: "The defendant has no duty to eliminate, reduce or make safer the inherent risks of injury which arise from the nature of the sport of recreational snowboard jumping or the manner in which it is conducted. An inherent risk of a sport is one that cannot be eliminated without fundamentally changing the nature of the sport or chilling vigorous participation in the sport. [¶] The defendant is under a duty to use ordinary care not to increase the risks to a snowboarder over and above those inherent in the sport. The defendant is under a duty to refrain from constructing a jump for use by the public which, by design, poses an extreme risk of injury. [¶] A failure to fulfill such duty is negligence."

The instructions that Bear Valley proffered on the subject of primary assumption of the risk stated the correct rule of law. It is unquestionably correct that a defendant has no duty to eliminate or reduce "inherent risks of injury which arise from the nature of the sport of recreational snowboard jumping or the manner in which it is conducted." It is also unquestionably true that nothing in the court's instructions, the arguments of counsel, or anything else that was said during the course of trial suggested that there is such a duty. While it would have been advisable for the court to have explicitly told the jury that defendant's only obligation was "not to increase the risks to a snowboarder over and above those inherent in the sport," this premise was made plain in the opening statements of counsel,[3] in the testimony of the experts, and in closing argument.[4] As the majority states, "[t]here was no dispute at trial that snowboarding is a very risky sport" (maj. opn., *ante*, at p. 601) and there was never the slightest suggestion that Bear Valley was liable for Vine's injuries if those injuries were caused by the risks inherent in snowboarding. Contrary to the statement in the majority opinion, the jury was not told to apply the ordinary standard of care "even if Bear Valley's conduct conformed to the standards customary in the ski resort industry." (Maj. opn., *ante*, at p. 596.)[5] The jury was told that Bear Valley

[3] In his opening statement, Vine's attorney told the jury, "The question that you are going to be asked to decide is: Once Bear Valley changed that jump, did they take a jump that was safe and turn it into one that was dangerous . . . ." In his opening statement, Bear Valley's attorney told the jury the evidence would show that "[t]he configuration of this jump and the risks of injury that it presented were open and obvious to all, including Ms. Vine, and that any snow configuration that you craft out there on the mountain . . . you can't eliminate the risk of injury from somebody who loses their body control, and in particular when they land upside down on their back and their shoulders and their neck. You can't eliminate that."

[4] For example, Bear Valley's attorney argued in closing that Vine had "not satisfied the preponderance of the evidence that it's more likely than not that the jump here created an excessive risk of injury as opposed to what we have to understand in this same situation is a risk of injury from anybody who falls on a jump. [¶] . . . [¶] So we contend that the jump by its design and by the evidence of its actual use and testimony we've heard presented only the usual or expected risks associated with the aerial jumping that was taking place. That's what we contend." In rebuttal, Vine's attorney argued, "Charlene Vine's equivalent impact of 12 feet broke her back. . . . [A] properly designed jump would have subjected Charlene Vine to impact forces less than 3.7 feet at the point of which she landed, and if this jump was properly designed, regardless of whether she landed on her feet or on her back, she would not have been injured. [¶] . . . [¶] This jump was a bad jump. There is no question about that."

[5] The jury was instructed that negligence is the doing of something which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do "under circumstances similar to those shown by the evidence," and that, although not necessarily controlling, evidence "as to whether a person conformed or did not conform to a custom that had grown up in a given locality or business is relevant and ought to be considered" in determining whether the person was negligent. At no point in the trial did anyone ever imply that Bear Valley was liable simply because it is foreseeable that injury may result from snowboard jumping. Indeed, the final argument of Vine's counsel, which the majority believes to have been "legally erroneous" (maj. opn., *ante*, at p. 603), emphasized that Bear Valley was liable if it was foreseeable that somebody would be injured *by a "screwup,"*

was liable only if it was negligent and it was asked to determine whether Bear Valley was "negligent in the design, construction, testing or supervision" of the jump on which Vine was injured. Vine's contention throughout was that the jump was negligently designed and constructed because it gave rise to excessive landing forces that were not apparent and not normally encountered in snowboarding. Based on the conflicting evidence, that is what the jury found. There is no basis to suppose that the verdict would have been different if the instructions had restated what was implicit throughout the trial.

The second reason Bear Valley contends that the instructions were erroneous is that the trial court refused to instruct on the obvious hazard doctrine. In view of the theory on which Vine relied at trial, the majority correctly rejects this contention. (Maj. opn., *ante*, at p. 598, fn. 11; see also, e.g., *Felmlee v. Falcon Cable TV* (1995) 36 Cal.App.4th 1032, 1040 [43 Cal.Rptr.2d 158]; *Osborn v. Mission Ready Mix* (1990) 224 Cal.App.3d 104, 114–122 [273 Cal.Rptr. 457].)

Bear Valley's final attack on the instructions is the trial court's failure to give an instruction on secondary assumption of risk. According to *Knight, supra,* 3 Cal.4th at page 315, secondary assumption of risk "is merged into the comparative fault scheme, and the trier of fact, in apportioning the loss resulting from the injury, may consider the relative responsibility of the parties." In discussing the issue with the trial judge, defense counsel agreed that secondary assumption of the risk "is encompassed by comparative negligence" and "is a component of the comparative elements." He argued that the jury should be told that Vine assumed responsibility for the inherent risks of snowboarding only in connection with his argument that the jury should be instructed on primary assumption of the risk.

Opposing counsel were in essential agreement as to what needed to be shown to establish secondary assumption of the risk. As Vine's attorney presented the matter to the court, to establish secondary assumption of the risk, Bear Valley "would have to prove it is actually a type of comparative negligence actually. In other words, the plaintiff was negligent in recognizing a risk and [accepted] bringing herself to that risk. [¶] . . . [¶] Secondary assumption of risk, I think defendants could still show . . . . [i]f the defendants say this jump does, in fact, increase the risks inherent in the sport, however,

---

(italics added) not by the normal risks of snowboarding. By the end of the trial, there could not have been the slightest misunderstanding on anybody's part that by a "screwup," counsel meant constructing a jump that produced far greater landing forces than normally encountered and reasonably anticipated by most snowboarders.

plaintiff you knew that. You saw the way this jump was designed. You knew that there was a risk of getting injured that was not necessary to the sport, and you nonetheless took the jump, that would be secondary assumption of risk." Defense counsel agreed: "There still remains this component which I think [plaintiff's counsel] did a pretty good job of explaining to the court which is the secondary assumption of risk which is a subjective-based analysis, and that is in the comparative negligence environment. [¶] . . . [¶] . . . It is the comparative negligence determination, was the plaintiff contributorily negligent. I say, Your Honor, we've submitted jury instructions on the question of comparative negligence which includes the secondary assumption of risk analysis because, again, [plaintiff's counsel] is correct when he says, this is an analysis that we get inside Ms. Vine's head, and we find out what she knew, what she appreciated, what she understood, and her willingness to venture forth, in light of, or with knowingly venturing forth and taking the jump in spite of her knowledge and appreciation of the risk she is exposed to. That's the secondary assumption of risk, and he is correct again. It is a comparative analysis. The jury can ascribe any level or percentage of comparative to the plaintiff they choose to."

Bear Valley did offer two proposed instructions on the subject of secondary assumption of risk.[6] However, there was no basis in the evidence for either instruction. The proposed instruction upon which Bear Valley ultimately relied stated that in determining the plaintiff's comparative negligence, the jury should consider "plaintiff's knowing encounter with a risk of injury *caused by defendant's breach*" and failure to avert a known "risk of harm *created by a defendant's breach of duty.*" (Italics added.) There was no evidence that Vine was told or perceived the additional risk that was created by the negligent configuration of the jump. To the contrary, Vine testified unequivocally that she had not observed anything unusual about the jump other than its length and all of her evidence was to the effect that the additional landing forces that were created by the jump were not apparent to

---

[6] After submitting a lengthier proposed instruction entitled "Comparative Negligence/Secondary Assumption of Risk," which included the statement that "A person who is aware of a risk of harm created by a defendant's breach of duty but fails to avert the harm is comparatively negligent for the injury," Bear Valley submitted an alternative instruction labeled "Comparative Negligence." That proposed instruction read, "If you find that defendant breached its duty of care to plaintiff, plaintiff's knowing encounter with a risk of injury caused by defendant's breach, if any, is to be considered by you in determining the plaintiff's comparative negligence or fault. A person who is aware of a risk of harm created by a defendant's breach of duty but fails to avert the harm is comparatively negligent for the injury. [¶] You should consider all of the surrounding circumstances established by the evidence, including, but not limited to, the plaintiff's maturity, intelligence, experience and capacity, along with all the other surrounding circumstances as shown by the evidence."

the normal snowboarder. Bear Valley offered no evidence suggesting otherwise.[7] Its position was that there was nothing unusual about the jump. It would have been error to have given such an instruction that was not supported by evidence in the record. (*LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 875 [148 Cal. Rptr. 355, 582 P.2d 946] [error to have given contributory negligence instruction for which there was no evidence in the record].)

In concluding that *Knight* requires a "plaintiff's encounter with the risk [to] be 'knowing' only in the general sense that the plaintiff understood the nature of the risk involved" (maj. opn., *ante*, at p. 599), the majority opinion correctly states that "[i]t is the *risk* that must be appreciated by a plaintiff for the assumption of risk doctrine to come into play, not the defendant's breach of duty" (maj. opn., *ante*, at p. 598). But this statement begs the question. The question is, the risk of what? *Knight* repeatedly makes clear that "in the assumption of risk context, it would be improper to impose all responsibility on a plaintiff who is aware of a risk of harm *created by the defendant's breach of duty* . . . ." (*Knight*, 3 Cal.4th at pp. 310–311, italics deleted and added.) Again, "In cases involving 'secondary assumption of risk'—where the defendant does owe a duty of care to the plaintiff, but the plaintiff proceeds to encounter a known risk imposed by the defendant's breach of duty—the doctrine is merged into the comparative fault scheme . . . ." (*Id.* at p. 315, italics added.) Bear Valley's proposed instruction would have been proper if there were any evidence that Vine had been aware that the jump in question produced greater landing forces than usual and nonetheless decided to take the jump. As the majority opinion acknowledges (maj. opn., *ante*, at p. 598), there was no such evidence. In order for such an instruction to have been applicable, there was no need for evidence that Vine was aware there had been negligence in the design or construction of the jump or for evidence that she was aware of the precise degree to which the risks had been increased by the defendant's negligence. But she did need to be aware that the conditions she was voluntarily encountering differed from those ordinarily encountered and inherent in the particular sporting activity. She needed to be aware of more than the normal risks of snowboard jumping or, as the majority opinion puts it, of "the risk of injuring herself in a fall on the snow." (Maj. opn., *ante*, at p. 599.)

---

[7] Indeed, when asked, "When you looked at this jump, you didn't see anything that was particularly hazardous about it; is that right?" Chris Gunnarson, one of the defendant's experts, confirmed, "That's correct." Vine was aware of, and acknowledged, the normal risks of snowboard jumping, but there is no evidence that she was aware of the increased risks created by the negligent manner in which the jury found the jump in question to have been designed and constructed.

To use the hypothetical employed by the majority, we may assume Bear Valley owed a duty to all snowboarders not to conceal a spike in the landing area of the jump. If a particular snowboarder knows there is a concealed spike in the landing area and nonetheless takes the jump, the snowboarder may assume some responsibility for being injured on the spike by virtue of secondary assumption of the risk, incorporated into the element of comparative negligence. (See, e.g., *Knight, supra,* 3 Cal.4th at pp. 314–315, citing *Kirk v. Washington State University* (1987) 109 Wn.2d 448 [746 P.2d 285, 290–291] and Diamond, *Assumption of Risk After Comparative Negligence; Integrating Contract Theory into Tort Doctrine* (1991) 52 Ohio St. L.J. 717, 748–749.) The snowboarder need not be aware of the percentage by which the hidden spike increases the risk of injury in order to assume that increased risk, but if there is no evidence that the snowboarder knows of the spike, she does not assume that risk, and it would be error for the court to give the assumption of risk, or comparative negligence, instruction. (See *LeMons v. Regents of University of California, supra,* 21 Cal.3d at p. 875.)

Bear Valley contends that the judgment should be reversed because the trial court failed to give an instruction that Bear Valley never proposed. Under *Knight*, a plaintiff may be charged with comparative responsibility for engaging in a risky activity even if doing so was not unreasonable (*Knight, supra,* 3 Cal.4th at p. 314) and the comparative negligence instruction that the trial court gave did not say so. However, Bear Valley never asked the trial court to say so. Indeed, when asked by the trial judge why the BAJI instruction on comparative negligence was not sufficient, Bear Valley's counsel responded, "I think [Bear Valley's proposed instruction is] important and an accurate assessment of the law since the *Knight* case, that helps to explain what is plaintiff's potential negligence in this context. A knowing encounter with a risk of injury *caused by the defendant's breach* in this sports environment here is—is comparative negligence." (Italics added.) Never did defense counsel ask the trial court to instruct the jury that plaintiff could be held partially responsible for her injury because she took a risky jump even if she was not negligent in doing so.[8] On appeal, Bear Valley has discerned a subtle point from a close reading of *Knight* that was never suggested in the trial court. Because there is no suggestion that the instructions that the trial court did give on comparative negligence misstated the law, the trial court's

---

[8] Indeed, defense counsel suggested that his initial proposed instruction might be modified by inserting "if any" after the phrase "plaintiff's knowing encounter with a risk of injury caused by defendant's breach," but he never suggested that the instruction be revised to tell the jury it might consider plaintiff's knowing encounter with the risks inherent in snowboarding regardless of negligence.

failure to give such a clarifying instruction that was not requested may not form the basis for reversal of the judgment. (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 948 [160 Cal.Rptr. 141, 603 P.2d 58], overruled on different ground in *White v. Ultramar* (1999) 21 Cal.4th 563, 574, fn. 4 [88 Cal.Rptr.2d 19, 981 P.2d 944] ["It is settled that a party may not complain on appeal that an instruction correct in law is too general or incomplete unless he had requested an additional or qualifying instruction"]; *Suman v. BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 9 [28 Cal.Rptr.2d 133] ["When a trial court gives a jury instruction which is correct as far as it goes but which is too general or is incomplete for the state of the evidence, a failure to request an additional or a qualifying instruction will waive a party's right to later complain on appeal about the instruction which was given"].)

Moreover, the trial judge's failure to have made this unrequested clarification resulted in no prejudice. The jury was instructed on the subject of comparative negligence and attributed 54.4 percent of the responsibility for Vine's injuries to Vine herself. There was no basis on which the jury could have done so other than by finding Vine responsible for having accepted the risks inherent in snowboard jumping. One of Vine's own experts testified that Vine was "not experienced enough" to have taken the "very big jump" on which she was injured. Vine herself acknowledged that she had considered whether to take a jump bigger than any she had ever done before. The jury must have concluded that Vine bore the major portion of responsibility for her accident by having decided to take that risk. By attributing 54.4 percent of the responsibility for her injury to Vine, the jury necessarily held her responsible for the consequences of taking a risky jump which she failed to execute properly.

The majority suggests that the jury's attribution of comparative negligence to Vine was "easily correlated with Vine's failure, despite her considerable snowboarding experience, to properly execute the fundamental jumping techniques" (maj. opn. *ante*, at p. 602), and that the jury might have attributed a still greater percentage of responsibility to her if it had been told that it could also consider the very riskiness of the activity without regard to fault. The evidence was undisputed that Vine's weight was not forward and that her body positioning was not as it should have been when she approached the jump. However, the defense did not argue that Vine's failure to execute the jump properly constituted negligence on her part. Bear Valley contended that the risk of not approaching a jump correctly is part of the inherent risk of snowboarding, not that a snowboarder who makes a poor jump is unreasonable or negligent. In his opening statement, defense counsel told the jury, "A fundamental risk [of snowboard jumping] is loss of body control. And that doesn't require any subjective knowledge on anybody's part, it is just a base element. The nature of the activity is aerial jumping, and if you can't eliminate loss of body control, then it is an essential risk in the activity. And I

think that the evidence will show that that's what happened here." The substantial proportion of responsibility that the jury attributed to Vine was not based on the determination that she was negligent in failing to execute a better jump, but that she was responsible because she assumed the risk that she might not take the jump correctly.

Bear Valley contended that the manner in which Vine took the jump went to the issue of causation. It argued that Vine's injuries were not caused by any negligence in the design or construction of the jump but by the poor form with which Vine took the jump. The jury undoubtedly considered Vine's faulty technique in determining her proportionate responsibility in causing her injury, and it did so despite the fact there was never any suggestion that Vine acted unreasonably or that her poor form constituted negligence. Since the jury could have considered Vine's contribution to the causation of her injury only after determining that she was for some reason at fault, the jury must have placed responsibility on her for having assumed the risk of taking the snowboard jump.

The majority opinion posits the possibility that the jury attributed fault to Vine based on her improper snowboarding technique. However, as just indicated, the defense never argued that the jury should do so. The suggestion that the jury nonetheless may have considered Vine's poor form to constitute negligence not only is entirely speculative, but disregards the fact that Bear Valley did argue that Vine's poor technique showed simply why Vine's injury was not *caused* by the configuration of the jump. And, as the majority opinion acknowledges (maj. opn., *ante*, at p. 601), in his closing argument Vine's attorney did attempt to convince the jury that it should not attribute negligence to Vine because she attempted a jump that she should have known was beyond her ability. Vine's attorney did not argue that this was an inappropriate factor for the jury to consider or suggest that if Vine was injured as the result of taking a jump that was beyond her ability she bore no responsibility for doing so. If under the trial court's instructions the jury found that Vine was negligent in attempting the jump with its inherent risk, as it apparently did, there would have been no reason for it to have increased the apportionment of fault to her if it had been told that she was responsible for taking that same risk even if she were not negligent in doing so.

Thus, there is absolutely no reason to believe that the result in this case would have been different if the jury had been told that Vine could be contributorily responsible for her injury even if she acted reasonably. The verdict plainly reflects that the jury understood this to be the case—which

perhaps is why Bear Valley never asked the trial court to give such an explicit instruction. In all events, no prejudice resulted from the trial court's failure to instruct more fully on the subject in a manner that was never requested by either party.

A petition for a rehearing was denied June 3, 2004, and respondent's petition for review by the Supreme Court was denied August 25, 2004. Kennard, J., Werdegar, J., and Chin, J., were of the opinion that the petition should be granted.